**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                 :

MARIA KATSIAVRIAS and,    :
NICK MEINTANAS,           :
                                   :

            Plaintiffs,    :      Civ. Action No. 06-4465 (SDW)
                                   :
                                   :

      v.                    :
                                   :      **OPINION**
                                   :

CENDANT CORP, REALOGY CORP.,  :
CENTURY 21 REAL ESTATE CORP.,  :      March 30, 2009
CENTURY 21 REAL ESTATE LLC.,  :
CENDANT GLOBAL SERVICES, INC., :
REALOGY GLOBAL SERVICES, INC., :
AND GEORGE PEREZ individually and, :
as Senior Manager International    :
Development & Services for Cendant and/:
Or Realogy,                 :
                Defendants.    :
_____  :

**Wigenton**, District Judge

Before the Court is Defendants' Cendant Corporation, Realogy Corporation, Century 21 Real Estate Corporation, Century 21 Real Estate LLC, Cendant Global Services, Inc., Realogy Global Services Inc., and George Perez (collectively "Cendant" or "Defendants")[1] Motion for Summary Judgment ("Summary Judgment Motion") pursuant to Fed. R. Civ. P. 56(c). The Court has jurisdiction pursuant to 28 U.S.C. § 1332(2). The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). The Court, having

---

[1] In or about August 2006, Cendant Corporation spun off its real estate division into a new entity, Realogy Corporation. Thus, the Amended Complaint names both Cendant entities and successor Realogy entities as Defendants.

considered the parties' submissions, decides this motion without oral argument, pursuant to Fed. R. Civ. P. 78.  For the reasons discussed below, the Court **grants** Defendants' Motion for Summary Judgment.

<u>**Background**</u>

Cendant was a global provider of real estate services, which licenses the Century 21 Real Estate brand. This case concerns the Master License Application ("Application") submitted by Plaintiffs Maria Katsiavarias ("Katsiavarias") and Nick Meintanas ("Meintanas"), husband and wife, in the name of Hellas R.E.,[2] to obtain the exclusive subfranchise rights to Century 21 for Greece. Plaintiff Katsiavrias was listed on the application as CEO, President, 50% owner, and the Principal Contact Person. Irini Panagiotaki, was listed as Secretary and 50% owner of Hellas R.E.[3]  Meintanas was not listed on the application[4]. On July 29, 2005, Defendants sold said subfranchising rights to the Starland Group ("Starland").

Plaintiff Meintanas maintains that he arranged for Shahram Sadaghati ("Sadaghati"), a New York real estate broker, to initiate contact with Century 21.  In January 2005, Sadaghati spoke to Defendant George Perez ("Perez"), Director of International Development for Cendant, about purchasing the Century 21 subfranchise rights for Greece; Sadaghati did not mention Meintanas during this conversation. In January 2005, Perez forwarded Sadaghati an Application and Brochure. In May, 2005, Plaintiffs returned the completed application form to Perez.

---

[2] Hellas R.E. never existed as a legal entity.
[3] Irini Panagiotaki is not a party to this lawsuit.
[4] Defendants' also aver that Meinantas does not have standing to sue in this matter as he was not a party to any signed agreement. While the Court agrees, the issue is moot given the Court's findings and dismissal of the Complaint.

On June 6, 2005, Perez e-mailed a Letter of Intent to Katsiavrias and Sadaghati, which proposed basic terms for a subfranchise agreement.[5] On June 16, 2005, Perez received an email purportedly from Katsiavrias[6], countering Cendant's proposed $350,000 franchise fee with $150,000. On June 24, 2005, Perez sent a revised Letter of Intent to Katsiavrias (copying Sadaghati and Meintanas), proposing an initial franchise fee of $300,000. The two-page Letter of Intent stated, in pertinent part, that:

> 1.   The initial franchise fee is payable *upon execution* of the Subfranchise Agreement.
>
> 5.   *Subject to approval* by [Cendant] Global [Services] of the prospective subfranchisor and *upon execution* of a definitive Subfranchise Agreement, the Subfranchisor *would have* the exclusive right to license the Century 21 marks. . . .
>
> 7.   *Upon agreeing* to the above basic terms and conditions, a non-refundable application fee of US $10,000 will be due via wire transfer. *In the event* that Global and your company *are able to reach an agreement* within a reasonably acceptable period of time (in no event to exceed sixty (60) days from the date of delivery of the First Draft of the Subfranchise Agreement), the US $10,000 non-refundable application fee will be credited against the initial franchise fee specified in paragraph one of this letter. If the subfranchise agreement is not executed within such reasonable time period, the US $10,000 non-refundable application fee, which shall be deemed fully earned upon receipt, will remain the property of Global.

(Ellert Cert. Ex. K) (emphasis added). On July 7, 2005, Katsiavrias signed the Letter of Intent, and wired Cendant the $10,000 application fee.

Upon receipt of the signed Letter of Intent and the application fee, Cendant e-mailed Katsiavrias a First Draft of the Century 21 International Subfranchise Agreement

---

[5] The Letter of Intent proposed basic terms such as proposed amounts for the initial franchise fee, royalties, service fees, advertising fund contribution, and the proposed duration of the agreement.
[6] Plaintiff Meintanas concedes that he used Katsiavrias' e-mail address unbeknownst to Perez.

for Greece ("First Draft").  The Letter of Intent and First Draft left several aspects open for negotiation[7] and reiterated that specific actions needed to take place *before* the deal was final.[8]

Although Cendant was in negotiations with Hellas R.E., they also were negotiating a deal with Starland, for a subfranchise agreement that included Greece. On June 7, 2005, Perez received an application fee and a signed Letter of Intent from Starland. On July 13, 2005, Perez informed Plaintiffs of Cendant's negotiations with Starland.  By July 25, 2005, Starland and Cendant were up to their Third Draft of a subfranchise agreement. On July 26, 2005 Perez e-mailed Katsiavrias and stated that:

> This confirms that I did discuss with Nick [Meintanas] on Monday that there is another prospect for the Century 21 subfranchising rights for the country of Greece. At the present time we have not entered into a contract with such prospect, but have returned a Third Draft of the Agreement in response to . . . [Starland's] Second Draft.

(Perez. Tr. 423:18-425:3; Ellert Cert. Ex. M).

After July 25, 2005, Plaintiffs never negotiated or discussed the First Draft with Cendant.

On July 29, 2005, Cendant signed a Master Franchise Agreement with the Starland Group. Plaintiffs were informed of this sometime thereafter and the $10,000 application fee was returned in August 2005.

---

[7] For example, the first draft, among other things: 1) provided that if the Subfranchisor failed to meet certain quotas Cendant reserved the right to convert the licensing rights from exclusive to non-exclusive, 2) omitted the minimum annual fee to be paid to Cendant, 3) required Katsiavrias to provide a guarantor/indemnifier, a complete list of entities and individuals to be covered by the non-compete provision, and the country/state where the subfranchisor is "validly existing".

[8] The letter transmitting the First Draft also reiterated that the $10,000 application fee would be credited against the initial franchise fee *in the event* Global and Hellas R.E. *are able to reach agreement* on or before September 7, 2005. It also stated that Cendant was *hopeful that they would be able to finalize their agreement* before the end of July 2005.

On July 2, 2007, Plaintiffs filed an Amended Complaint ("Complaint") alleging: 1) Breach of Contract; 2) Fraud; 3) Interference with Prospective Economic Advantage; 4) Breach of the Duty to Negotiate in Good Faith; 5) violation of the New Jersey Consumer Fraud Act; 6) Promissory Estoppel; and 7) seeking Specific Performance.

On October 7, 2008 Defendants filed the instant Motion for Summary Judgment seeking to dismiss Plaintiffs' Complaint with prejudice.

**Legal Standard**

**Summary Judgment**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sheilds v. Zuccarini*, 254 F.3d 476, 481 (3rd Cir. 2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material

fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

**Legal Analysis**

**Breach of Contract**

Where parties do not intend to be bound until a formal contract is executed, an enforceable contract does not exist even if the parties had a tentative agreement on some terms. *See Fletcher – Harlee Corp. v. Pote Construction Contractors*, Inc., 421 F. Supp. 2d 831, 834 (D.N.J. 2006), *aff'd*, 482 F.3d 247 (3d Cir. 2007) (holding that a subcontractor was not bound, where express language stated that company would not be liable for bid submitted pending execution of a written agreement); *Material Technologies, Inc. v. Carpenter Technology Corp.*, Civ. No. 01-2965, 2004 U.S. Dist. LEXIS 28892, *31 (D.N.J. Dec. 15, 2004) (holding that, even if an oral agreement had been reached, because an agreement on essential terms was not reached, the parties' manifest intent to be bound by a written agreement only, precluded enforcement of the alleged oral agreement); *Morales v. Santiago*, 217 N.J. Super. 496, 502 (App. Div. 1987) (holding that when parties intend that their preliminary agreement will be subject to the terms of the later contract, they are not bound by their preliminary agreement).

Moreover, the absence of agreement on essential terms demonstrates that no contract exists. *See Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (holding that where the parties have not agreed to one or more essential terms, the agreement is unenforceable); *Hardy v. Hangen*, 134 N.J. Eq. 176, 177 (Ch. 1943) (holding that a

contract does not exist so long as negotiations are pending over matters which either of the parties regards as material).

In the case at bar, the parties manifested intent to be bound only after approval by Cendant and execution of the formal, written, subfranchise agreement. The June 24, 2005 Letter of Intent expressly stated that the deal was "[s]*ubject to approval* by Cendant . . . *and upon execution of a definitive Subfranchise Agreement the subfranchiser would have the exclusive right to license* . . . . (Ellert Cert. Ex. K (emphasis added)). The plain language of the Letter of Intent was clear and unambiguous; Plaintiffs would not have exclusive subfranchise rights until after execution of a definitive Subfranchise Agreement and Cendant's approval of same.  Neither event occurred.  Additionally, the July 7, 2005 cover letter to the First Draft included language such as: "*Should we be unable to conclude* a transaction", "the Subfranchise Agreement *will be negotiated*", "[*i*]*n the event* Global and your company *are able to reach agreement*", and "the *contemplated transaction*." (Ellert Cert. Ex. L.) (emphasis added). The connotation of said language is that no agreement had yet to be reached.  Thus, it is clear that the parties manifested intent was to be bound after the parties reached a formal written Subfranchise Agreement, which did not occur. Accordingly, because the parties did not intend to be bound until a formal contract was executed an enforceable contract does not exist. *See Fletcher – Harlee Corp. v. Pote Construction Contractors*, Inc., 421 F. Supp. 2d 831, 834 (D.N.J. 2006), aff'd, 482 F.3d 247 (3d Cir. 2007)

Furthermore, several essential terms were unresolved between the parties. The First Draft fails to state: 1) who, along with Katsiavrias, would be the Guarantors/Indemnifiers of the subfranchise agreement, 2) what the trade name of the

subfranchise would be, 3) the minimum quota of offices to be opened and the date said offices will be open, 4) who would be covered by the covenant not to compete, and 5) the annual minimum service fee.  Said terms were essential elements of the proposed transaction; they determine who would be bound by the agreement and the obligations of each party. Thus, because the parties did not agree on one or more essential terms, the agreement is not enforceable. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992).

Because the parties did not intend to be bound until after a formal written agreement was executed and because the parties failed to agree on essential terms, any alleged agreement is unenforceable. After construing the facts and inferences in a light most favorable to the nonmoving party, this Court finds that no genuine issue of material fact exists. Accordingly, this Court *grants* Defendants' Motion for Summary Judgment as it pertains to Plaintiffs' Breach of Contract claim.

## **Fraud**

To establish a claim of common law fraud, the plaintiffs must evidence: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely upon it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *McCormac v. Qwest Commc'ns Int'l*, 387 N.J. Super. 469, 485 (App. Div. 2006).  The essence of every fraud is that one party gains an unfair advantage "by means of some act or omission that is unconscientious or a violation of good faith." *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 319 N.J. Super. 435, 445 (App. Div. 1998).  Fraud must be proven by clear and convincing evidence. *Baldasarre v. Butler*, 254 N.J. Super. 502, 521, 604 A.2d 112 (App.Div.1992), *rev'd in part on other grounds,* 132 N.J. 278, 625 A.2d 458 (1993).

"[A] party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.'" *N.J. Econ. Dev. Auth.*, 319 N.J. Super. at 446. Absent a duty to disclose, silence is not fraudulent concealment. *Id*. A franchisor-franchisee relationship is not fiduciary; the parties "contract at arms' length" and "there is no duty of disclosure where the parties are negotiating at arms' length for a franchise." *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1430 (S.D. Fla. 1996); *See also Supervalu, Inc. v. Associated Grocers, Inc.*, 428 F. Supp. 2d 985, 989-991 (D. Minn. 2006) (Even where the parties expressly agreed to negotiate in good faith, defendant did not have a duty to disclose third party negotiations).

In the present case, Defendants did not have a duty to disclose their negotiations with Starland. The parties' relationship to each other is that of a franchisor-franchisee relationship. Consequently, no fiduciary relationship exists, the transaction is not fiduciary in nature, and no party expressly reposed a trust or confidence in the other. *N.J. Econ. Dev. Auth.*, 319 N.J. Super. at 446. Thus, absent a duty to disclose, Defendants' silence cannot be fraudulent concealment. *N.J. Econ. Dev. Auth.*, 319 N.J. Super. at 446.

Moreover, Plaintiffs cannot establish common law fraud. First, neither Cendant nor Perez made a material misrepresentation of a past or presently existing fact. Although Plaintiffs allege that Defendants, specifically Perez, misrepresented Cendant's negotiations with a third party (Starland), Defendants did not have a duty to disclose said negotiations. Perez never held Cendant out as negotiating exclusively with Plaintiffs; he simply stated that there was no other contract in existence for the Greece territory – this

was a true statement at the time.  Moreover, once Perez believed that Starland would enter a contract with Cendant, he notified the Plaintiffs before said contract was executed. Plaintiffs simply failed to act timely.  Second, the record is clear that there was no contract with Starland at the time Perez made his statement. Perez could not have known of or believed in the falsity of his statement because his statement was true.  Third, there exists no evidence that Perez or Cendant intended that Plaintiffs rely on the statement. In fact, Perez himself was harmed by the contract to Starland because he did not earn a commission on the sale of the subfranchising rights.  Fourth, Plaintiffs reliance upon said statement that Cendant did not have a contract out with a third party is not reasonable. Plaintiffs never bargained for, nor were they promised, exclusive negotiating rights. Plaintiffs' reliance upon Greek custom is unavailing in this Court. Lastly, Plaintiffs cannot evidence any damages. Plaintiffs received a full refund of the $10,000 non-refundable application fee; there is no evidence of any other damages. After construing the facts and inferences in a light most favorable to the nonmoving party, this Court finds that no genuine issue of material fact exists. Accordingly, Defendants' Motion for Summary Judgment is *granted* as it pertains to Plaintiffs' Fraud claim.

**<u>Interference with Prospective Economic Advantage</u>**

To establish a claim for tortious interference with economic persepective, "the plaintiff must demonstrate some reasonable expectation of economic advantage, that the defendant's actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse, a reasonable probability that the plaintiff would have obtained the anticipated economic benefit and that the injury caused the plaintiff damage." *Weil v. Express Container Corp.*, 360 N.J. Super. 599, 613-614 (App. Div.

2003); *Citing Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751-52, 563 A.2d 31 (1989).  "Fundamental to this cause of action is the requirement that the claim be directed against defendants who are not parties to the contractual relationship."  *Weil,* 360 N.J. Super. at 614; *See also Med. Soc'y of N.J. v. Amerihealth HMO, Inc.*, 376 N.J. Super. 48, 60 (App. Div. 2005) ("a tortious interference claim will not lie where the claim is directed against a defendant who is a party to the contract at issue"); *Van Natta Mechanical Corp. v. Di Staulo,* 277 N.J. Super. 175, 183 (App. Div. 1994) ("Fundamental to [a claim of tortious inference]…is a requirement that the claim be directed against defendants who are not parties to the relationship").  Additionally, every claim based on tortious interference with economic advantage requires "that such interference be malicious."  *Kopp, Inc. v. United Techs, Inc.*, 223 N.J. Super. 548, 559 (App. Div. 1988).  Malice is defined as "the intentional commission of a wrongful act without justification or excuse." *Id*. at 560.

Plaintiffs concede that the evidence does not support a viable claim for Tortious Interference with Economic Prospective. As such, Defendants' Motion for Summary Judgment as it pertains to Interference with Economic Prospective is *granted*.

**Breach of Duty to Negotiate in Good Faith**

"The scope of any obligation to negotiate in good faith can only be determined from the framework the parties have established for themselves in their letter of intent." *A/S Apothekernes Laboratorium v. I.M.C. Chemical Group, Inc*., 873 F.2d 155, 159 (7th Cir. 1989); *See also Supervalu*, 428 F. Supp. 2d at 992 ("A generalized duty to negotiate in good faith [found in a letter of intent] does not require disclosure of competing negotiations").

> [A] letter of intent…[is] merely an agreement to negotiate, not a promise that those negotiations would be fruitful. A duty to *negotiate* in good faith does no encompass an automatic duty to approve the final deal. A letter of intent is no guarantee that the final contract will be concluded, even if the parties fulfill their good faith obligations.

*A/S Apothekernes Laoraatorium*, 873 F.2d at 159 (citations omitted).

Here, the scope of obligation to negotiate in good faith does not include a right to exclusively negotiate with Cendant. Neither the June 24, 2005 Letter of Intent, nor the July 7, 2005 letter accompanying the First Draft, contains any agreement to a period of exclusive negotiations, nor did Plaintiffs bargain or pay for it. In other words, because the scope of negotiations outlined in the Letter of Intent and the First Draft did not include a right to exclusively negotiate, the Defendants did not breach a duty to negotiate in good faith. Defendants were not required to disclose computing negotiations. *Supervalu*, 428 F. Supp. 2d at 992. After construing the facts and inferences in a light most favorable to the nonmoving party, this Court finds that no genuine issue of material fact exists. Accordingly, Defendants' Motion for Summary Judgment as it pertains to Plaintiffs' claim for Breach of Duty to Negotiate in Good Faith is *granted*.

**New Jersey Consumer Fraud Act Claim**

The NJCFA protects against fraud in the purchase of consumer goods or services. It does not protect against fraud in the purchase of a franchise. *J&R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.,* 31 F.3d 1259, 1274 (3d Cir. 1994) (NJCFA did not apply to the purchase of a restaurant franchise because it was not a good purchased for consumption).

In this case, Plaintiffs can not establish a claim under the NJCFA because they did not seek to purchase "merchandise" protected under the act. *J&R Ice Cream*, 31 F.3d at

1270-74; citing N.J. Stat. Ann. § 56:8-1(c).  Because Plaintiffs were seeking to purchase a commercial franchise, their claim under the NJCFA is not viable. *Id*. After reviewing the facts and inferences in a light most favorable to the nonmoving party, this Court finds that no genuine issue of material fact exists. Accordingly, Defendants' Motion for Summary Judgment as it pertains to Plaintiffs' NJCFA claim is *granted*.

**<u>Promissory Estoppel</u>**

In order to state a claim of promissory estoppel it must be shown that there was "(1) a clear and definite promise, (2) made with the expectation that the promissee would rely on it, and (3) reasonable reliance upon the promise, (4) which results in definite and substantial detriment."  *Travel Lodge Hotels, Inc. v. Honeysuckle Enterprises, Inc*., 357 F. Supp. 2d 788 (D.N.J. 2005).  Absent evidence to the contrary, where the defendant never expressly agreed to exclusively negotiate with the plaintiff, a claim of promissory estoppel cannot be established.  *See Kopp, Inc. v. United Techs, Inc.*, *supra,* 223 N.J. Super at 556 (App. Div. 1988).

Here, there is no evidence that a "clear and definite promise" was made to the Plaintiffs.  In the e-mail correspondences between the parties there is never any mention of exclusive negotiating rights, only the exclusive right to sell subfranchises in Greece once the parties had finalized their agreement, which the parties did not do. In fact, Katsiavrias testified that she never sought assurances that the parties were exclusively negotiating for the Greek territory. Although Plaintiff believed -- based upon Greek custom -- that they had exclusive negotiating rights, this sentiment was never expressly stated. Because Defendants never made a clear and definite promise to exclusively negotiate with Plaintiffs, their claim based on Promissory Estoppel fails.  After reviewing

the facts and inferences in a light most favorable to the nonmoving party, this Court finds that no genuine issue of material fact exists. Accordingly, Defendants' Motion for Summary Judgment, as it pertains to Promissory Estoppel is *granted*.

## Specific Performance

> The right to specific performance is not absolute, but rests in judicial discretion -- not an arbitrary, capricious discretion, but sound judicial discretion, controlled by established principles of equity, and exercised upon the consideration of all the circumstances of each particular case. The contract must possess certain elements, to demand of equity the exercise of its jurisdiction to enforce performance. It must be upon a valuable consideration. It must be mutual in its obligations and in its remedy. It must be perfectly fair, equal and just in its terms and in its circumstances, and the situation must be such that the remedy of specific performance will not be harsh or oppressive. The contract must be such that the court is able to make an efficient decree for its specific performance, and to enforce the decree when made. Pomeroy's Eq. § 1405."

*Taussig v. Corbin; West Disenfecting Co. v. Corbin*, No. 21; No 22, 1906 U.S. App. LEXIS 3671 (3d. Cir. 1906).

In this case, specific performance is not warranted. There is no contract between the parties. The Court determined, *supra*, that no duty existed between the parties. Therefore, the Court declines to exercise discretionary jurisdiction. An award of specific performance, in this case, would be both harsh and oppressive because the parties never reached an agreement. Accordingly, Defendants' Motion for Summary Judgment is hereby *granted* as it pertains to specific performance.

## Conclusion

For the reasons stated above, this Court **GRANTS** Defendants' Motion for Summary Judgment in its entirety.

s/Susan D. Wigenton, U.S.D.J.

Orig:  Clerk
cc:     Hon. Madeline Cox Arleo, U.S.M.J.
        Parties